IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TERI L. MZOZOYANA,                          :

      Plaintiff,

                                :

    v.                                      Case No. 3:19-cv-091

                                :   JUDGE WALTER H. RICE

DENIS R. MCDONOUGH,
Secretary, Department of
Veteran Affairs,                            :

      Defendant.

---

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DOC. #26); CONFERENCE CALL TO
RESCHEDULE TRIAL AND OTHER DATES

---

Plaintiff, Teri L. Mzozoyana ("Mzozoyana" or "Plaintiff"), filed a complaint

against Denis R McDonough, Secretary of her employer, the Department of

Veteran Affairs ("VA" or "Defendant"). Doc. #1. Count One alleges that Defendant

unlawfully discriminated against Plaintiff due to her race in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. Count Two alleges that

Defendant unlawfully discriminated against Plaintiff due to her age in violation of

the Age Discrimination Enforcement Act of 1967, 29 U.S.C. § 621 et seq.

This matter is before the Court pursuant to a Motion for Summary Judgment filed by the VA. Doc. #26 ("Motion" or "Motion for Summary Judgment"). For the reasons set forth below, Defendant's Motion is overruled.

## I. Factual Background

Plaintiff, Teri Mzozoyana, was the Human Resources Officer ("HRO"), a "service chief," at the Columbus, Ohio, VA Ambulatory Care Center ("Columbus VA") from early 2000 until November 12, 2016. Doc. #25, PageID##134, 226, 232. She was then temporarily promoted to Acting Associate Director from November 13, 2016, until March 5, 2017. *Id.*, PageID#232. After the temporary promotion, Plaintiff returned to her previous position as HRO. *Id.* However, she was subsequently demoted to Human Resource Specialist ("HRS") on November 26, 2017. Doc. #25-1, PageID#492.

Plaintiff alleges that her November 26, 2017, demotion was motivated by both race and age discrimination. In response, the VA contends that she was demoted not because of her race or age, but because she violated the VA's rules against nepotism. Doc. #26, PageID#562. Specifically, the VA contends that Plaintiff changed a newly created position's classification, and that change allowed her husband to qualify for the position when he previously did not. *Id.*, PageID#564-565. The VA also contends that Plaintiff failed to adequately inform her supervisors that her husband had both applied and was being considered for the position. *Id.*, PageID#562. The VA contends that her actions, even if not

2

specifically intended to benefit her husband, nonetheless created the appearance of nepotism and the appearance alone warranted the demotion. *Id.*

The circumstances surrounding Plaintiff's demotion are detailed below.

### A. Creation of the Position and Classification Decision

In early 2016, the Columbus VA created a new trainer ("EMS Trainer") position for its Environmental Management Service ("EMS"). Doc. #25, PageID##238-239. EMS prepared a job description for the EMS Trainer position and sent it to the Columbus VA's human resources office for classification[1]. *Id.*

As HRO, Plaintiff was responsible for both assigning and approving the classifications for all jobs at the Columbus VA. *Id.*, PageID#227. She assigned the classification task for the new EMS Trainer position to an HRS, Cindy Lamprecht. *Id.*, PageID##239-240. On February 24, 2016, Ms. Lamprecht classified the EMS Trainer position as WL-3566, which is a wage grade ("WG") position. Doc. #25-1, PageID#493. Plaintiff approved of the classification on March 29, 2016, and her supervisor, Director Wendy Hepker ("Director Hepker"), also approved of the classification on April 4, 2016. *Id.* Due to the WL-3566 classification, the EMS Trainer position was restricted to preference eligible veterans, assuming an eligible veteran was available. Doc. #25, PageID##248-249.

---

[1] Classification is necessary to determine a new position's qualifications and salary.

However, EMS then indicated it wanted the EMS Trainer position to be a general schedule ("GS") rather than a WG position. Doc. #25, PageID#240. Ms. Lamprecht asked Plaintiff to enlist a different VA station to help with the new classification. *Id.* The Dayton VA had recently created and classified a similar position, *id.*, and on May 16, 2016, Plaintiff asked the Dayton VA if they could help classify the Columbus VA's new Trainer position. Doc. #25-2, PageID##507-508. The Dayton VA obliged and returned a pay grade classification of GS-9. *Id.*

Consistent with the Dayton VA's recommendation, Plaintiff informed Director Hepker that the EMS Trainer position was being reclassified as a GS-9 pay grade. Doc. #25, PageID#241. However, she testified in her deposition that Director Hepker told her the EMS Trainer position should instead be classified as a GS-7 pay grade, and EMS would need to amend the job description accordingly. *Id.* Plaintiff informed EMS of the change, and EMS amended the job description. *Id.*

Not wanting to further delay EMS's hiring process, Plaintiff testified that she unilaterally classified the EMS Trainer position as GS-1712, a GS-7 pay grade, without further collaboration with the Dayton VA or Ms. Lamprecht. *Id.* She submitted the classification on July 12, 2016, and Director Hepker approved of the classification on July 19, 2016. Doc. #25-2, PageID#499.

As a result of the ultimate classification change from WL-3566 to GS-1712, the EMS Trainer position was no longer restricted to preference eligible veterans. Doc. #25, PageID##248-249. Plaintiff's husband was not a preference eligible

4

veteran, *id.*, PageID#249, and the new classification allowed him to apply for the position five months later.

### B. Mzozoyana's Temporary Promotion and EMS's Hiring Decision

On November 13, 2016, Plaintiff was temporarily promoted from the HRO position to the Acting Associate Director for the Columbus VA. *Id.*, PageID#231. As the Acting Associate Director, she directly supervised EMS Chief Novella Fulmore, who would be responsible for hiring the EMS Trainer position. *Id.*, PageID#279.

The EMS Trainer position was publicly posted on December 14, 2016. Doc. #25-1, PageID#455. Plaintiff's husband, Mbulelo Mzozoyana, subsequently found the EMS Trainer position on USAJobs.gov and applied on December 29, 2016. Doc. #24, PageID##143 and 147. Plaintiff maintains that she did not know her husband had applied for the job until after he already submitted his application, which was just prior to the application's closing date of January 3, 2017. Doc. #25, PageID##252-254. After learning of her husband's application, Plaintiff contends she informed him that she could not provide any assistance in the process. *Id.*, PageID##255-258. She maintains that Mr. Mzozoyana respected her position and never requested, nor did she offer, any assistance in the application or subsequent interview process. *Id.*

Mr. Mzozoyana was one of several candidates ultimately selected for an interview by a three-person panel. The panelists rated the applicants numerically, and Mr. Mzozoyana was given a numeric score of 55, whereas another applicant,

Kelvin Lancaster, was given a higher numeric score of 61. *Id.*, PageID##287-288. Accordingly, the panel recommended Mr. Lancaster over Mr. Mzozoyana for the EMS Trainer position. *Id.*, PageID#292.

However, EMS Chief Fulmore overruled the panel's recommendation and hired Mr. Mzozoyana. *Id.* EMS Chief Fulmore never justified her decision in writing, *id.*, PageID##289-290, but Plaintiff maintains she never discussed her husband's application with EMS Chief Fulmore. *Id.*, PageID#280. However, Plaintiff admits that due to the uniqueness of her and her husband's shared name of "Mzozoyana," other employees at the Columbus VA would likely recognize a connection. *Id.*, PageID##221 and 299. Additionally, Plaintiff admits that while her position as Acting Associate Director (i.e., the direct supervisor of EMS Chief Fulmore) was temporary, EMS Chief Fulmore did not know who would be the permanent associate director. *Id.*, PageID#297.

### C. Mzozoyana's Coordination with Director Hepker

Plaintiff returned to her previous position as HRO on March 5, 2017. *Id.*, PageID#232. While she admits that EMS Chief Fulmore made her initial hiring decision prior to Plaintiff leaving the Associate Director position on March 5, 2017, *id.*, PageID#297, it is unclear from the record exactly when Mr. Mzozoyana was offered the EMS Trainer position or when Plaintiff learned of the offer to her

husband.[2] Nonetheless, on May 11, 2017, which was after she learned of the offer but prior to the start of her husband's onboarding process, Plaintiff reached out to Arlene Shively, the Deputy Chief Counsel for the Office of District Counsel. *Id.*, PageID##261-262; Doc. #25-2, PageID##521-524. Plaintiff informed Ms. Shively of the situation and sent her an email in which she stated she had "**no** involvement in the [*sic*] any part of the process at all." Doc. #25-2, PageID##523-524 (emphasis in original). She asked Ms. Shively if there were any concerns regarding nepotism, and Ms. Shively responded that Plaintiff had likely not run afoul of any prohibitions on nepotism because she indicated in her email to Ms. Shively that she had "recused [herself] from working on any phase of [her] husband's hiring action." *Id.*, PageID##522-523. Afterwards, Plaintiff testified that she also informed Director Hepker of Mr. Mzozoyana's hiring and the email exchange with Ms. Shively. Doc. #25, PageID#309-312. Plaintiff claims she offered to rescind the job offer if Director Hepker thought doing so was necessary, but Director Hepker responded that it would be unnecessary. *Id.*, PageID#311-312.

Mr. Mzozoyana completed his onboarding process and was officially hired into the EMS Trainer position on June 11, 2017. Doc. #25-1, PageID#461.

---

[2] Defendant did not provide this information in its Motion for Summary Judgement or its reply. Plaintiff contends in her response that she reached out to Arlene Shively "shortly after" she learned of her husband's hiring, Doc. #32, PageID#625, but she has not cited to the record to support this contention.

### D. Mzozoyana's Demotion and EEO Complaint

In July 2017, an anonymous complaint was made to the VA's Office of the Inspector General regarding the hiring of Plaintiff's husband. Doc. #25-2, PageID#527. A factfinding was conducted, and the conclusions were given to Associate Director Jamie Kuhne ("Associate Director Kuhne").[3] *Id.* Based on the findings, she issued Plaintiff a notice of proposed removal under 38 U.S.C. § 714. *Id.* The proposed removal was based on both Plaintiff's alleged violations of the VA's nepotism rules and on her allegedly inaccurate statement that she had "no involvement in any part of the process at all." *Id.*, PageID##527-528.

Director Hepker sustained the allegations against Plaintiff but mitigated the removal to a demotion from HRO to HRS. *Id.*, PageID#528. The demotion lowered her pay grade from GS-13 to GS-12, resulting in an approximate pay cut of $20,000 annually. Doc. #25-1, PageID#492. Director Hepker justified her decision by noting that Plaintiff "failed to take the proactive steps to clearly and specifically recuse [herself] from the processes resulting in [her husband's] selection." *Id.*, PageID#489. Director Hepker further noted that the demotion was warranted, based on the "manner in which [Plaintiff] classified the position that created the opportunity for [her] husband to qualify for the position." *Id.*

Following her demotion, Plaintiff filed an Equal Employment Opportunity ("EEO") complaint on January 24, 2018, alleging that her demotion was the result

---

[3] Jamie Kuhn was hired to the Associate Director position following the end of Plaintiff's temporary promotion to the position. Doc. #25, PageID#297.

of race and age discrimination. Doc. #25-2, PageID#525. The VA issued its Final

Agency Decision ("FAD") denying her complaint on February 22, 2019. *Id.*

Plaintiff then filed a Complaint, Doc. #1, in federal court alleging (1)

unlawful discrimination based on race in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. 2000e-2(a)(1) ("Title VII"), and (2) unlawful discrimination

based on age in violation of the Age Discrimination in Employment Act of 1967, 29

U.S.C. § 621 et seq. ("ADEA").

Following discovery, Defendant filed its Motion for Summary Judgement,

Doc. #26. This matter is now ripe for consideration.


## II.    Standard of Review for Motion for Summary Judgement

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex*

*Corp.v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial

responsibility of informing the court of the basis for its motion and identifying

those portions of the record which it believes demonstrate the absence of a

genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d

1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party

must present evidence that creates a genuine issue of material fact making it

necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61

F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998). In determining whether a genuine

10

dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the Court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.   Count One: Racial Discrimination under Title VII

Count One of the Complaint alleges racial discrimination in violation of Title VII. Doc. #1, PagedID#4. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

Claims of racial discrimination under Title VII can be proven by either presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003). Because Plaintiff has no direct evidence that her demotion was due to her race, Doc. #25, PageID#354, she must present circumstantial evidence, which is analyzed under the *McDonnell Douglas* burden shifting framework. Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* claim of discrimination by a preponderance of the evidence. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (citing

11

*McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)). Then, should the plaintiff succeed in establishing a *prima facie* claim, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 254. Finally, should the defendant carry its burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *Id.* Importantly, "although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392 (6th Cir. 2008) (citing *Burdine*, 450 U.S. at 256).

At the summary judgment stage, "a district court considers whether there is sufficient evidence to create a genuine [issue of material fact] at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6thCir. 2000). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that a *prima facie* case of discrimination has been established. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citing *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996)). The defendant must then offer sufficient evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is a pretext for unlawful discrimination. *Id.*

Plaintiff must first establish a *prima facie* claim of discrimination by a preponderance of the evidence. The *prima facie* requirement "is not onerous," *Burdine,* 450 U.S. at 253, and poses "a burden easily met." *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987). This stage is "not meant to stymie plaintiffs, but simply serves to 'bring the litigants and the court expeditiously and fairly to the ultimate question.'" *Cline,* 206 F.3d at 660 (quoting *Burdine,* 450 U.S. at 253).

In the context of racial discrimination under Title VII, Plaintiff must show that (1) she was a member of a protected class; (2) she was discharged or otherwise punished; (3) she was qualified for the position; and (4) she was replaced by a person outside the class, or similarly situated non-protected employees were treated more favorably. *Regan v. Faurecia Auto. Seating, Inc.,* 679 F.3d 475, 481 (6th Cir. 2012). Defendant does not contest that Plaintiff has satisfied the first three elements of the *prima facie* showing. Doc. #26, PageID##572-573. Instead, the VA argues that Plaintiff failed to establish a *prima facie* case since her comparators, Director Hepker and Associate Director Kuhne, were not similarly situated and were not named by Plaintiff in her deposition testimony. *Id.;* Doc. #34, PageID#385. The Court will address each of these arguments below.

To be treated as similarly situated, an employee must "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Mitchell v. Toledo Hospital,* 964 F.2d 577 (6th Cir.1992). However, an exact correlation in the factors discussed in *Mitchell* is not required, and courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998); *Jackson v. FedEx Corporate Services, Inc.,* 518 F.3d 388, 396 (6th Cir. 2008) ("The purpose of Title VII and Section 1981 are not served by an overly narrow application of the similarly situated standard.").

Although Plaintiff identified Associate Director Kuhne, Director Hepker, James Dusenberry ("Dusenberry"), Catherine Gnau ("Gnau"), Cynthia Gress ("Gress") and James Kuck ("Kuck") in her Complaint as potential comparators, Doc. #1, PageID#4, only Associate Director Kuhne and Director Hepker engaged in the "same conduct" as Plaintiff is alleged to have engaged in, i.e., nepotism. Neither of these two comparators, however, received any punishment.

Specifically, Plaintiff testified in her deposition that "when Ms. Hepker was the director at Chillicothe she [Ms. Hepker] contacted the Columbus director asking if there were positions that her husband could apply for[.]" Doc. #25, PageID#411. She also testified that Associate Director Kuhne's brother-in-law was hired and "assigned so he would be in her line of oversight," but after supervisory HR specialist John Westling reminded her of Plaintiff's demotion for a similar action, her brother-in-law was reassigned "to another department that she did not have oversight for[.]" *Id.,* PageID##413-414. Both Associate Director Kuhne's and

14

Director Hepker's actions arguably constitute nepotism, which is the "same conduct" that formed the basis of Plaintiff's demotion. Based upon the cautionary language in both *Ercegovich,* 154 F.3d at 352, and *Jackson*, 518 F.3d at 396, the Court finds both Associate Director Kuhne and Director Hepker to be similarly situated to Plaintiff. It does not find Plaintiff's employment status as a human resource officer and service chief at the Ambulatory Care Center and later a temporary Acting Associate Director to be relevant. Plaintiff's employment status vis-à-vis the employment status of these two non-protected supervisors is a distinction without a difference.

Defendant next argues that Associate Director Kuhne and Director Hepker should not be considered comparators because to do so would permit Plaintiff to contradict her sworn deposition testimony. Doc. #34, PageID#685. The VA contends in its Reply that Plaintiff testified twice at her deposition that Dusenberry, Gnau, Gress and Kuck were the "only" similarly situated comparators. Doc. #34, PageID#686 (citing Doc. #25, PageID#405). Although the VA is correct that a plaintiff, in response to a motion for summary judgment, cannot submit an affidavit that contradicts her earlier deposition testimony, *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006); *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 433-34 (6th Cir. 2006). The Court has reviewed the VA's two asserted contradictions as well as the 37 pages of deposition testimony preceding them and, for the reasons explained below, does not find any "contradiction" in Plaintiff's testimony. Doc. #25, PageID##368-405.

The deposition transcript shows that counsel for the VA questioned Plaintiff about her interrogatory answer in which she identified only Dusenberry, Gnau, Gress and Kuck as employees who were treated more favorably than she was and "similarly situated" to her. Plaintiff's interrogatory answer described the four individuals as "[L]ike myself, . . . service chiefs at the [A]mbulatory [C]are [C]enter" with Director Hepker making "the final decision to take disciplinary action or not." Doc. #25, PageID#161-62 (Doc. #25-2, PageID#549).  Immediately following this testimony, counsel for Defendant asked Plaintiff to identify other individuals besides the four "service chiefs" referenced in her interrogatory answer who received more favorable treatment.  However, he restricted Plaintiff's answer to other individuals who were "treated more favorably than you by" Associate Director Kuhne and/or Director Hepker. Doc. #25, PageID#369-70.

> Q. "I'm going to go through each [of the four individuals] in a moment, but first other than those four individuals. . . is there anyone else that you can name that you believe was treated more favorably than you?
>
> A. That were similarly situated to me? As a comparator, right?
>
> Q. Yes. Exactly. And particularly, since you've alleged discrimination against Director Hepker and Associate Director Kuhne, it will be <u>people treated more favorably than you by one or both of them</u> that you believe to be similarly situated.
>
>       \*           \*          \*
>
> Q. At any time. If you believe that they, excuse me, treated someone more favorably than you at any time.
>
> A.  And it would be both of them?

Q. Either or both.

A. Okay. Those are the only four that I can remember right now, yes. Those are the only four.

Q. Okay. Well, we'll ask if there's anybody else again after we go through these four to try to exhaust it.

A. Okay.

Q. So let's start at the beginning. So[,] the first name is Cynthia Gress?

*Id.* (emphasis added).

After testifying about the circumstances of the favorable treatment that Associate Director Kuhne and/or Director Hepker accorded to each of the four above-named service chiefs, *id.* at PageID##370-405, Plaintiff was asked if she could think of anyone else. *Id.*, PageID#405.[4] Because she responded that she could not, Defendant argues that her Response that Associate Director Kuhne and Director Hepker are similarly situated comparators contradicted this sworn deposition testimony.

Because the questions from counsel for the Defendant limited the pool of similarly situated comparators to those individuals who would have been treated

---

[4] Plaintiff also identified Paula Spurlin as a possible comparator.  However, she later retracted her testimony concerning this witness and apologized for naming her because she realized Spurlin was a supervisor and not one of the "[service chief[s] at the [A]mbulatory [C]are [C]enter" and that Director Hepker was not at the VA at the time Spurlin's issue was addressed. "I'm sorry if that one was not applicable. . . she wasn't at the service chief level . . .Ms. Hepker had left by the time this action came up with Ms. Spurlin. So[,] it would have been a little different[,] but it would have been different altogether[,] but I just . . . wasn't sure if it would be applicable. . ." *Id.* at PageID#404.

more favorably by either Associate Director Kuhne or Director Hepker, the Court does not find that Plaintiff contradicted her deposition testimony by arguing in her Response that these two supervisors are comparators. Accordingly, there exists a genuine issue of material fact as to whether a *prima facie* claim of discrimination exists under the *McDonnell Douglas-Burdine* analysis.

Establishment of the *prima facie* case creates a "presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254. Defendant then must rebut that presumption by articulating (but not proving) a nondiscriminatory reason for the adverse employment action. *Id*. Here, Defendant maintains that Plaintiff was demoted because she violated the VA's policies against nepotism. Specifically, Defendant contends that Plaintiff (1) changed the position's classification which, at a minimum, had the effect of benefiting her husband, (2) neglected to distance herself from her husband's hiring, (3) misrepresented to Director Hepker that she had "<u>no</u> involvement" in the hiring process, and (4) even if Plaintiff's actions were not intended to benefit her husband, the mere appearance of nepotism is a sufficient independent basis for demotion. Doc. #26, PageID##580-584. Because Defendant's explanation is

consistent with both federal law[5] and the VA's handbook,[6] *id.*, PageID##562-564,

the Court finds that Defendant has met its burden of articulating a legitimate, non-

discriminatory reason for Plaintiff's demotion.

Should a defendant carry its burden of production, the plaintiff is still left

with an opportunity to prove by a preponderance of the evidence that the

legitimate reasons offered by the defendant were instead merely a pretext for

discrimination. *Burdine*, 450 U.S. at 254. A plaintiff can show pretext by

demonstrating "that the proffered reasons (1) had no basis in fact; (2) did not

actually motivate the decisions; or (3) were insufficient to warrant the decisions."

*Roseman v. Int'l Union, UAW*, No. 20-2151, 2021 WL 4931959, at *4 (6th Cir. 2021)

---

[5] Under 5 U.S.C. § 3110(b), "[a] public official may not appoint, employ, promote, advance, or advocate for appointment, employment, promotion, or advancement, in or to a civilian position in the agency in which he is serving or over which he exercises jurisdiction or control any individual who is a relative of the public official." Additionally, under 5 U.S.C. § 2302(b)(6), federal employees may not "grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements for any position) for the purpose of improving or injuring the prospects of any particular person for employment."

[6] Defendant notes that VA rules and regulations emphasize that "extreme care" must be taken to avoid not only nepotism, but even the appearance of nepotism:

> Extreme care must be taken to avoid any possibility or likelihood that the nepotism law may be violated in an employment action. Appointing and selecting officials will be guided by the regulations and policy requirements in 5 CFR, part 310. Management officials will take appropriate actions to avoid situations which have the potential for, or appearance of, being in violation of nepotism requirements. As a minimum, management officials and HRM Officers will identify and document those instances in which relatives are employed, or are being considered for employment, in the same organizational element or in positions within the same chain of command.

Doc. #25-2, PageID#509.

(citations omitted). The Sixth Circuit has described the three-part test "as a commonsense inquiry." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 & n.4 (6th Cir. 2009). The Court has also stated that "it is important to avoid formalism in its application, lest one lose the forest for the trees. . ." since "[A]t the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id*. The "burden is not heavy." *George v. Youngstown State University*, 966 F.3d 446, 462 (6th Cir. 2020).

In *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), abrogated on other grounds by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), the Court described the first and third showings as "direct attacks on the credibility of the employer's proffered motivation" with the first requiring some evidence that the reasons are "factually false." *Id*. (quotations omitted). Evidence for the third showing is somewhat different and "ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* These two types of direct attacks on the employer's credibility "provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Id*. (quoting *St. Mary's Center v. Hicks*, 509 U.S. 502, 511 (1993)). This showing permits the factfinder "to infer illegal discrimination from the plaintiff's *prima facie* case."

20

*Manzer*, 29 F.3d at 1084. *Manzer's* second showing, however, is "of an entirely different ilk:"

> [T]he plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Id.* (emphasis in original).

Here, Plaintiff has produced sufficient evidence to create a genuine issue of material fact concerning whether the asserted legitimate reasons offered by the VA were instead a pretext for discrimination under both the second and third *Manzer* showings. Defendant's stated motivations for demoting Plaintiff include the following accusations: (1) changing the position's classification benefitted Plaintiff's husband; (2) she did not adequately distance herself from her husband's hiring process; (3) she misrepresented that she had "no involvement" in the hiring process; and (4) her husband's hiring created the "appearance of nepotism." Doc. #26, PageID##580-584. However, Plaintiff argues that based on the weight of the evidence, race discrimination is a more likely motivator than any of Defendant's four accusations. Doc. #1, PageID#4. To that argument, the Court finds that Plaintiff has provided sufficient evidence to create a genuine issue of fact under both the second and third *Manzer* tests.

First, Plaintiff testified in her deposition that she never unilaterally chose to reclassify the EMS Trainer position. The EMS department told Plaintiff it wanted the EMS Trainer position to be a general schedule ("GS") rather than a wage grade ("WG") position. Doc. #25, PageID#240. Then, after Plaintiff informed Director Hepker that she had reclassified the position as a GS-9 pay grade consistent with the EMS department's desires, Director Hepker told Plaintiff that the position should be further reclassified as a GS-7 rather than GS-9. Doc. #25, PageID#241. According to Plaintiff's testimony, not once did Plaintiff reclassify the position without explicit direction. Therefore, under the second *Manzer* test, while Plaintiff's reclassification of the position certainly had the ultimate effect of benefitting her husband, the factual circumstances surrounding her conduct could allow a reasonable jury to conclude that an illegal motivation was *more* likely to have motivated her demotion.

Second, Plaintiff testified that, prior to the start of her husband's onboarding process, she informed both Director Hepker and VA Regional Counsel Arlene Shively of the situation and requested guidance. Doc. #25, PageID##307-312. She further testified that she even offered to rescind her husband's job offer if Director Hepker thought doing so was necessary to avoid nepotism issues. *Id.* Based on this testimony, a reasonable jury could conclude under the second *Manzer* showing that Plaintiff acted pro-actively to remedy any potential nepotism issues and that her demotion was not actually motivated by any alleged neglect in addressing the nepotism issues. Plaintiff has also provided evidence of pretext

22

under the third *Manzer* showing. According to Plaintiff's deposition testimony, Associate Director Kuhne arguably did not "distance herself" regarding her brother-in-law's hiring, including when she assigned him to be in her line of oversight. Unlike Plaintiff, however, Associate Director Kuhne was not demoted, but instead "reminded" by a supervisory HR specialist that her brother-in-law should be reassigned to another department for which she did not have oversight. Doc. #25, PageID##413-414.

Third, while the VA contends that Plaintiff misrepresented her role by telling Director Hepker and Ms. Shively that she had "**no** involvement in any part of the [hiring] process at all," Doc. #26, PageID#567, a reasonable jury could conclude otherwise. Specifically, Plaintiff testified that she (1) did not classify the position for her husband's benefit, Doc. #25, PageID#249; (2) did not help her husband with the interview process, *id.*, PageID#253; and (3) did not influence EMS Chief Fulmore's hiring decision. *Id.*, PageID##295-296. Accordingly, under the second *Manzer* showing, Plaintiff's deposition testimony has created a genuine issue of material fact concerning the truthful nature of her representations to Director Hepker and Ms. Shively.

Finally, there exists a genuine issue of fact as to whether the hiring of Plaintiff's husband into the EMS Trainer position created an "appearance of nepotism" under both the second and third *Manzer* showings. Doc. #26, PageID#563. As alleged in the Complaint, Plaintiff's demotion was the result of an "anonymous complaint made to the VA's Office of the Inspector General." Doc.

#1, PageID#2. It is unclear whether that is sufficient to indicate an outward appearance of nepotism. Additionally, if such an appearance was created simply because of the shared named "Mzozoyana" and because the position was within Plaintiff's chain of command as Associate Director, then it is unclear why Director Hepker and Ms. Shively failed to raise these concerns in their initial conversations with Plaintiff. Based on Plaintiff's testimony, Director Hepker and Ms. Shively were both seemingly aware of the basic factual circumstances surrounding the hiring. When asked whether Director Hepker was aware that "someone in [Plaintiff's] management chain was the selecting official for [her] husband's job," Plaintiff replied "yes." Doc. #25, PageID##410-411. Plaintiff also testified that she informed Ms. Shively about her husband being "offered a job here as a Training Specialist." Doc. #25-2, PageID#523. Those hiring circumstances seemingly did not warrant nepotism concerns during Director Hepker and Ms. Shively's initial conversations with Plaintiff. Why then, did the "appearance of nepotism" later become a significant motivation for Plaintiff's demotion? Under the second *Manzer* showing, the "sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that" the VA's explanation for Plaintiff's demotion "is a pretext, or coverup." *Manzer*, 29 F.3d at 1084. Moreover, this same "appearance of nepotism" was equally evident in Director Hepker's efforts to find a job for her husband and in Associate Director Kuhne's initial assignment of her brother-in-law to her "line of oversight." Under the third *Manzer* showing, concerns regarding this "appearance of nepotism" were not enough for either of

24

these two supervisors to be demoted. Accordingly, under both the second and third *Manzer* tests, whether an "appearance of nepotism existed" is the essence of a genuine issue of material fact.

The Court finds that Plaintiff has provided sufficient evidence to create a genuine issue of material fact for her Title VII race discrimination claim. Accordingly, the Court overrules Defendant's Motion for Summary Judgement, Doc. #26, on Count One.


## IV.   Count Two: Age Discrimination under the ADEA

Count Two of the Complaint alleges age discrimination in violation of the ADEA. Doc. #1, PagedID#4. The ADEA makes it unlawful for an employer "to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of such individual's age, or to classify or refer for employment any individual on the basis of such individual's age." 29 U.S.C. § 623(b).

Like claims of race discrimination under Title VII, claims of age-based discrimination under the ADEA can be proven by either presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Merhulik v. Weltman, Weinberg & Reis Co. LPA*, No. 21-3773, 2022 WL 1583418, at *4 (6th Cir. May 19, 2022). Because Plaintiff has no direct evidence that her demotion was due to her age, Doc. #25, PageID#354, she must present circumstantial evidence, which is analyzed under the *McDonnell Douglas* burden shifting framework. As the Court previously explained, under the

*McDonnell-Douglas* framework, a plaintiff must first establish a *prima facie* claim of discrimination by a preponderance of the evidence. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)). Next, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 254. Finally, the plaintiff then must prove by a preponderance of the evidence that the reasons offered by the defendant were merely a pretext for discrimination. *Id.*

Plaintiff must first establish a *prima facie* claim of discrimination by a preponderance of the evidence. For a *prima facie* case of age discrimination under the ADEA, "a plaintiff must show: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Relevant here, such circumstances would include when the employer "treated similarly situated, non-protected employees more favorably." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008) (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007)). Courts compare age discrimination plaintiffs to specific non-protected employees to determine whether the other employee is similarly situated in all "relevant respects." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 809 (6th Cir. 2020) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Defendant argues that none of Plaintiff's four proffered comparators were "similarly situated." Doc. #26, PageID##572-573. At the summary judgment stage, "a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6th Cir.2000). As the Court previously explained, a reasonable jury could conclude that Plaintiff and her comparators Associate Director Kuhne and Director Hepker engaged in the "same conduct," and thus were similarly situated. Therefore, there is a genuine issue of fact concerning the *prima facie* showing of age discrimination under the ADEA.

Following the *prima facie* showing, the burden of production then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Burdine*, 450 U.S. at 254. Here, Defendant maintains that Plaintiff was demoted because she violated both federal law and the VA's policies against nepotism, Doc. #26, PageID##580-584. The Court finds that Defendant has met its burden of articulating a legitimate reason for Plaintiff's demotion.

Finally, since Defendant carried its burden of production, Plaintiff must then prove by a preponderance of the evidence that the legitimate non-discriminatory reasons offered by the defendant were merely a pretext for discrimination. *Burdine*, 450 U.S. at 254. As the Court has previously discussed in this Decision and Entry, Plaintiff has provided sufficient evidence under both the second and third tests of *Manzer* , 29 F.3d at 1084, to create genuine issues of material fact

27

concerning whether Defendant's proffered motivations were instead a pretext for discrimination.

The Court finds that Plaintiff has provided sufficient evidence to create a genuine issue of material fact for her ADEA age discrimination claim. Accordingly, the Court overrules Defendant's Motion for Summary Judgement, Doc. #26, on Count Two.

## V.    Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgement, Doc. #26, is OVERRULED.

Counsel will take note that a telephone conference call will take place with the Court beginning at 10:30 a.m. on Tuesday, November 15, 2022, to reset the trial date and other dates leading to the resolution of this litigation.

Date: November 10, 2022

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

28